```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------x
                                   :
AIXA RIVERA,                       :
                                   :
            Plaintiff,             :          ORDER
                                   :
                                   :          17-CV-2856 (KAM)
      -against-                    :
                                   :
COMMISSIONER OF SOCIAL SECURITY,   :
                                   :
            Defendant.             :
                                   :
----------------------------------x
```

**KIYO A. MATSUMOTO, United States District Judge:**

Pursuant to 42 U.S.C. § 405(g), plaintiff Aixa Rivera ("plaintiff") appeals the final decision of the Commissioner of Social Security (the "Commissioner") denying her Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). Before the court are the parties' respective cross-motions for judgment on the pleadings. For the following reasons, the court GRANTS in part and DENIES in part plaintiff's motion for judgment and DENIES defendant's motion. The action is remanded for further proceedings consistent with this Order.

## BACKGROUND

### I.  Procedural History

Plaintiff applied for DIB on May 14, 2014, alleging disability since January 18, 2013. (Tr. 10.) Plaintiff alleged disability due to diabetes and injuries to her left shoulder and back. (Tr. 72.) The Social Security Administration ("SSA")

denied plaintiff's claim on August 5, 2014.  (Tr. 71, 84.)  In

September 2014, plaintiff requested a hearing before an

Administrative Law Judge, (Tr. 91-92), and on June 14, 2016, a

hearing was held before Administrative Law Judge Ifeoma N.

Iwuamadi (the "ALJ"), (see Tr. 36-70 (hearing transcript)).  In

a decision (the "ALJ Decision," Tr. 7-25) dated July 28, 2016,

the ALJ found plaintiff not disabled within the meaning of the

Act.  (Tr. 22.)  On August 25, 2016, plaintiff requested that

the Appeals Council review the ALJ Decision.  (Tr. 33-34.)  The

Appeals Council denied review on April 11, 2017, making the

Commissioner's decision final.  (Tr. 1-6.)

        Plaintiff commenced the instant action on May 10,

2017.  (See Complaint, ECF No. 1.)  Pursuant to the briefing

schedule initially set in a scheduling order entered on May 15,

2017, (ECF No. 5), and extended on August 7, 2017, (see August

7, 2017 Docket Order), the parties filed cross-motions for

judgment on the pleadings on April 9, 2018.  (Plaintiff's Notice

of Motion for Judgment on the Pleadings, ECF No. 12; Defendant's

Notice of Motion for Judgment on the Pleadings, ECF No. 14.)

Plaintiff and defendant have each submitted a memorandum of law,

but neither party has responded or replied.  (See Plaintiff's

Memorandum of Law ("Pl. Mem."), ECF No. 13; Defendant's

Memorandum of Law ("Def. Mem."), ECF No. 15.)  Additionally, the

parties have filed a joint stipulation of facts applicable to

each party's motion.  ("Stip." or the "stipulation," ECF No. 15-1.)  Plaintiff requests that the court reverse the ALJ Decision and remand this action "solely for calculation of benefits," or alternatively that the court vacate the ALJ Decision and remand this action.  (Pl. Mem. 16.)  Defendant contends that the ALJ did not commit error and the ALJ Decision should be affirmed. (Def. Mem. 27.)

## II.  The ALJ Decision

### A.  General Background

The ALJ found the following: (1) plaintiff met the insured status requirements of the Act through June 30, 2018; (2) plaintiff had not engaged in substantial gainful activity since January 18, 2013, the alleged onset date; (3) plaintiff had the following severe impairments: left shoulder tendinosis, status post left shoulder arthroscopy, a cervical spine disc bulge, a lumbar spine disc herniation, left sided cervical radiculopathy, a partial tear of the left wrist, a left knee meniscus tear, diabetes, and fibromyalgia; (4) plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"; (5) plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) subject to certain additional physical and exertional

limitations specified in the ALJ Decision;[1] and (6) plaintiff was capable of performing her past relevant work as a daycare supervisor.  (Tr. 12-21.)

## B.   RFC Analysis

In analyzing plaintiff's RFC, the ALJ relied on diagnostic imaging and other medical tests, and on records of medical examinations.

### 1.   Diagnostic Imaging and Other Medical Testing

The ALJ noted that plaintiff injured her back and shoulder in a motor vehicle accident on January 18, 2013.  (Tr. 14.)  Plaintiff subsequently underwent MRIs of her neck and back in late March of 2013.  (*Id.*; Stip. ¶ 5 (citing Tr. 263-64).)  The MRI of her back revealed a small central disc herniation between the L5 and S1 vertebrae.[2]  (Tr. 14; *accord* Stip. ¶ 5

---

[1]    Specifically, the ALJ concluded that plaintiff:

> has the residual functional capacity to perform sedentary work as defined in 20 CFR § 404.1567(a) except that she can sit for up to 6 hours in an 8-hour workday, stand and/or walk for up to 6 hours in an 8-hour workday, as well as lift and/or carry and push and/or pull no more than 10 pounds occasionally.  [Plaintiff] cannot operate foot controls using the left foot.  [Plaintiff] can use hand controls frequently.  [Plaintiff] can reach overhead occasionally, and frequently handle and finger objects. She can occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds.  She can occasionally stoop, but never kneel or crawl.  She must avoid concentrated exposure to dust, odors, fumes and pulmonary irritants.

(Tr. 13.)

[2]    "A herniated disk refers to a problem with one of the rubbery cushions (disks) between the individual bones (vertebrae) that stack up to make [the human] spine."  Mayo Clinic, *Herniated Disk*, *available at* https://www.mayoclinic.org/diseases-conditions/herniated-disk/symptoms-

(citing Tr. 264).)  The MRI of plaintiff's neck revealed three

disc bulges, specifically at C4-5, C5-6, and C6-7, but did not

reveal any disc herniations or spinal stenosis.[3]  (Tr. 14; *accord*

Stip. ¶ 5 (citing Tr. 263).)

     Additionally, a June 2013 MRI of plaintiff's left

wrist "produced findings consistent with a partial tear and

'normal intrinsic carpal ligaments with normal carpal alignment

and carpal tunnel.'"  (Tr. 14 (citing Tr. 265-66); *see also*

Stip. ¶ 8 ("The MRI conducted on June 11, 201[3][4] showed that

[plaintiff] may have a partial tear of the cartilage in her

wrist, but otherwise normal imaging." (citing Tr. 265-66)).)

Further, testing performed in connection with Dr. Aric

Hausknecht's examination of plaintiff in June 2013 "produced

results consistent with left-sided C5-6 radiculopathy."[5]  (Tr.

---

causes/syc-20354095 (last accessed Aug. 6, 2019).  The L-5 and S-1 vertebrae
are located in the lumbar and sacral spine, respectively, or lower back area.
Johns Hopkins Medicine, *Lumbar Disk Disease (Herniated Disk)*, *available at*
https://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disor
ders/lumbar_disk_disease_herniated_disk_85,P00783 (last accessed Aug. 6,
2019).

[3]     A bulging disc occurs when the outer lining of an intervertebral disk
breaks down, thereby allowing the nucleus of the ring to bulge out.  Johns
Hopkins Medicine, *Lumbar Disk Disease (Herniated Disk)*, *available at*
https://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disor
ders/lumbar_disk_disease_herniated_disk_85,P00783 (last accessed Aug. 6,
2019).  The C4-5, C5-6, and C6-7 vertebrae are located in the cervical spine,
or neck area.  *Id.*  "Spinal stenosis is a narrowing of the spaces within
[the] spine, which can put pressure on the nerves that travel through the
spine.  Spinal stenosis occurs most often in the lower back and the neck."
Mayo Clinic, *Spinal Stenosis: Symptoms and Causes*, *available at*
https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-
causes/syc-20352961 (last accessed Aug. 6, 2019).

[4]     The stipulated facts mistakenly dated the MRI test as June 11, 2017.
(*Compare* Stip. ¶ 8 *with* Tr. 265.)

[5]     "Electromyography (EMG) measures muscle response or electrical activity
in response to a nerve's stimulation of the muscle. The test is used to help

14; *see also* Stip. ¶ 8 (noting plaintiff's visit to Dr. Hausknecht).)

Plaintiff also underwent a left knee MRI in November 2014 and a right shoulder MRI in 2016. (Tr. 17.) The left knee MRI showed joint effusion and a complete tear of cartilage in plaintiff's knee. (Stip. ¶ 8 (citing Tr. 456-57); *accord* Tr. 17.) The right shoulder MRI revealed various problems with plaintiff's right shoulder, including joint effusion, acromioclavicular arthrosis, rotator cuff tendinosis with a surface tear of the supraspinatus tendon, and biceps tenosynovitis with synovitis of the rotator cuff interval.[6] (Tr. 17 (citing Tr. 474, 546).) Finally, plaintiff underwent an electrocardiogram, with normal results. (Tr. 16.)

### 2. Medical Examinations, Diagnoses, and Opinions

#### i. Dr. Hausknecht

With respect to records of medical examinations, including the diagnoses and opinions set forth in those records, the ALJ noted that Dr. Hausknecht examined plaintiff on June 3,

---

detect neuromuscular abnormalities." Johns Hopkins Medicine, *Electromyography (EMG)*, *available at* https://www.hopkinsmedicine.org/healthlibrary/test_procedures/neurological/electromyography_92,p07656 (last accessed Aug. 6, 2019). "Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column." Johns Hopkins Medicine, *Radiculopathy*, *available at* https://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/acute_radiculopathies_134,11 (last accessed Aug. 6, 2019).

[6] Although not noted by the ALJ, plaintiff also underwent an MRI of her left shoulder in April 2013, which revealed tendinosis, but no muscle tears. (Stip. ¶ 7 (citing Tr. 259-60, 261-62).)

2013. (Tr. 14.) Dr. Hausknecht diagnosed "cervical derangement with C3-4 through C6-7 disc bulges, lumbosacral derangement with L5-S1 disc herniation, left shoulder and wrist arthropathy and aggravation of underlying degenerative joint disease. (Stip. ¶ 8 (citing Tr. 268); *accord* Tr. 14.) Dr. Hausknecht also noted that plaintiff "exhibited muscle weakness and hypoesthesia," or numbness, "to light touch in a left C5-C6-C7 distribution." (Stip. ¶ 8 (citing Tr. 267); *accord* Tr. 14.) "He recommended that [p]laintiff continue physical therapy and prescribed Tramadol for pain as needed." (Stip. ¶ 8.) Dr. Hausknecht opined that plaintiff was totally disabled. (Tr. 14.)

### ii. Dr. Wilson

The ALJ also noted that Dr. Stephen Wilson examined plaintiff. (Tr. 14.) The parties note that Dr. Wilson is a physiatrist and that he examined plaintiff on March 7, 2013. (Stip. ¶ 3.) Dr. Wilson diagnosed derangement, myofascial pain syndrome, and muscle and ligament strains and sprains affecting plaintiff's cervical, thoracic, and lumbar spine. (Tr. 14 (citing Tr. 248-53).) Dr. Wilson also diagnosed left shoulder and wrist derangement and opined that plaintiff had a "moderate partial disability." (*Id.*)

### iii. Dr. Han

Next, the ALJ noted that Dr. Ji Han, who the parties note is an anesthesiologist, examined plaintiff in September

2013.  (Tr. 15; Stip. ¶ 12.)  Dr. Han noted, in relevant part,
limited flexion in plaintiff's cervical and lumbar spine, as
well as muscle tenderness in plaintiff's trapezius and lumbar
region and muscle spasms in plaintiff's trapezius.  (Tr. 15
(citing Tr. 277-81); *see also* Stip. ¶ 12 (discussing Dr. Han's
findings).)  Dr. Han also noted positive straight leg raise
tests and diminished sensation at plaintiff's L5 and S1
vertebrae.  (Tr. 15 (citing Tr. 279); *accord* Stip. ¶ 12.)  Dr.
Han administered an epidural steroid injection, (Tr. 15
(citation omitted); *accord* Stip. ¶ 12 (citing Tr. 281-84)),
which the parties agree plaintiff tolerated and provided
significant pain relief.  (Stip. ¶ 12.)  The ALJ noted that
plaintiff had also received "chiropractic manipulation and
trigger point injections into the cervical region," and that her
neck pain "was described as improved."  (Tr. 15 (citing Tr. 247-
357).)

        The ALJ also noted that Dr. Han completed a residual
functional capacity assessment of plaintiff in July of 2014.
(Tr. 18 (citing Tr. 445-55).)  He opined that plaintiff could
sit for up to 6 hours, and stand and/or walk for up to 2 hours,
in each case in an 8-hour day.  (*Id.* (citing Tr. 448).)
Additionally, Dr. Han opined that plaintiff could lift and/or
carry up to 10 pounds occasionally and push and/or pull no more
than 20 pounds.  (*Id.* (citing Tr. 448-49).)

### *iv.  Dr. Seldes*

Additionally, the ALJ noted that plaintiff had undergone left shoulder surgery in June of 2013.  (Tr. 15 (citing Tr. 382-440).)  The record indicates that Dr. Richard Seldes performed the surgery.  (Tr. 377-79.)  In discussing the procedure, the ALJ observed that records from a June 2013 pre-surgical examination resulted in normal findings including, in relevant part, that plaintiff had "no spinal tenderness or spasm, negative straight leg raising, . . . [and] a normal gait."  (Tr. 15 (citing Tr. 400-03).)  The surgery was an "arthroscopic acromioplasty debridement of a SLAP tear, debridement of a cuff tear, distal clavicle excision, and a left shoulder injection."[7]  (*Id.; see also* Stip. ¶ 9 (discussing surgery and citing surgical records at Tr. 377-79).)

After plaintiff's surgery, she underwent a regime of physical therapy and Celebrex for pain relief and received follow-up evaluations by Dr. Seldes.  (Tr. 15 (citations omitted).)  The ALJ specifically noted a December 2013 examination by Dr. Seldes, in which he found some tenderness and stiffness, and recommended ongoing physical therapy.  (*Id.*

---

[7]    "A SLAP tear is an injury to the labrum of the shoulder, which is the ring of cartilage that surrounds the socket of the shoulder joint."  American Academy of Orthopaedic Surgeons, *SLAP Tear*, *available at* https://orthoinfo.aaos.org/en/diseases--conditions/slap-tears/ (last accessed Aug. 6, 2019).

(citing Tr. 369).)  Although not noted by the ALJ, Dr. Seldes's examination report also states that he recommended that plaintiff continue to take Celebrex for pain, and administered a cortisone injection to plaintiff's left shoulder.  (Tr. 369.)

### v.    Drs. Mikelis and Lattuga

The ALJ further noted evaluations by two physicians associated with New York Spine Specialists, Drs. Demetrios Mikelis and Sebastian Lattuga.  (Tr. 15-16; *see also* Stip. ¶¶ 21, 23.)  Dr. Mikelis examined plaintiff in April 2014.  (Tr. 15; *see also* Stip. ¶ 21 (citing Tr. 362-64).)  Plaintiff complained of lower back and left shoulder pain, and reported that epidural injections had not alleviated her back pain.  (Tr. 15; *accord* Tr. 362.)  Dr. Mikelis found restricted ranges of motion, tenderness and spasms, and altered sensation in plaintiff's lumbar and cervical spine.  (Tr. 15-16; *accord* Tr. 363.)  Dr. Mikelis also found abnormal reflexes in plaintiff's upper and lower extremities.  (*Id.*)  He diagnosed cervical spine pain with a nerve root impingement, a lumbar disc herniation, and left lumbar radiculopathy.  (Tr. 16; *accord* Tr. 363.)  Plaintiff opted to treat these conditions conservatively.  (Tr. 16; *accord* Tr. 363-64.)

Dr. Lattuga examined plaintiff in May 2014, and obtained similar results to those obtained by Dr. Mikelis.  (Tr. 16; *see also* Tr. 360.)  Like Dr. Mikelis, Dr. Lattuga diagnosed

cervical spine pain with nerve root impingement, a lumbar disc herniation, and left lumbar radiculopathy.  (Tr. 16; *accord* Tr. 360.)  Additionally, Dr. Lattuga directed plaintiff to "refrain from any activity that exacerbates symptoms such as heavy lifting, carrying or bending and follow-up as instructed for a repeat evaluation."  (Tr. 16 (quoting Tr. 361).)

### vi.  *Dr. Fkiaras*

Plaintiff underwent an examination by Dr. John Fkiaras, a state agency consultant, on June 24, 2014.  (*Id.; see also* Stip. ¶ 24 (citing Tr. 365-68).)  The ALJ wrote that Dr. Fkiaras noted that plaintiff had a slow and mildly antalgic gait, and that her cervical spine had full and pain-free motion in all directions.  (Tr. 16; *accord* Tr. 366-67.)  Dr. Fkiaras also noted limited flexion in plaintiff's lumbar spine, left shoulder, and hips, as well as full motion in plaintiff's right shoulder.  (Tr. 16; *accord* Tr. 367.)  Dr. Fkiaras also found some decreased sensation to light touch of the left upper extremity and over the left lateral thigh, but no other sensory deficits.  (Tr. 16-17; *accord* Tr. 367.)

Dr. Fkiaras diagnosed low back pain, left shoulder pain, and diabetes.  (Tr. 17; *accord* Tr. 368.)  Additionally, Dr. Fkiaras opined that plaintiff "has a moderate limitation walking, climbing stairs, and standing," "is restricted from any lifting, carrying[,] pushing, pulling, squatting, kneeling,

crouching, and bending," "has a moderate limitation sitting

extended periods," and "has a moderate to severe limitation

reaching with her upper left extremity." (Tr. 17 (quoting Tr.

368).)

### vi. Dr. Sure

The ALJ considered treatment records from Dr. Hertzel

Sure, who saw plaintiff several times from 2013 through 2016.

(Tr. 16; *see also* Stip. ¶¶ 16, 20, 22, 25, 28-30 (citations

omitted); Tr. 475 (exam notes from 2016).) One of these

records, generated following a January 2014 examination, noted

plaintiff's history of diabetes and described it as

"uncomplicated." (Tr. 16; *accord* Tr. 482.) Additionally, Dr.

Sure's records indicate that plaintiff was obese, but that Dr.

Sure found "no adverse manifestations" arising from plaintiff's

obesity. (Tr. 16.) The ALJ observed that in April 2014,

plaintiff reported "no active complaints" to Dr. Sure, and that

in July 2014, plaintiff's primary complaint was tooth pain and

her examination results were unremarkable. (*Id.*; *accord* Tr.

489, 493.)

Additionally, the ALJ noted that plaintiff's December

2014 visit to Dr. Sure resulted in a finding that she was fit to

undergo knee surgery to repair her torn meniscus. (Tr. 17; *see

also* Stip. ¶ 28 (citing Tr. 499-501).) Plaintiff also visited

Dr. Sure in April 2015 and complained of body aches, itchiness,

headaches, finger stiffness, insomnia, and inability to concentrate. (Tr. 17.) The April 2015 examination results were, in part, positive for joint pain, but negative for back pain and limitation of motion. (*Id.; accord* Tr. 502.) In connection with plaintiff's April 2015 visit, Dr. Sure diagnosed dermatitis, obesity, a meniscal injury, insomnia, diabetes, and migraine headaches. (Tr. 17; *accord* Tr. 503.)

As the ALJ noted, plaintiff returned to Dr. Sure in May 2015 with complaints of "whole body pain," headaches, and finger numbness and tingling and July 2015 with complaints of swelling in her hands and feet. (Tr. 17; *see also* Tr. 508-09 (May 18, 2015 examination notes), Tr. 512-14 (July 19, 2015 examination notes).) The July 2015 examination notes indicate that plaintiff suffered from fibromyalgia, but indicate no neurological deficits, muscle tenderness, or muscle spasm. (Tr. 17; *accord* Tr. 512-13.)

Dr. Sure again examined plaintiff in August 2015, and the examination again produced "negative results." (Tr. 17; *see also* Tr. 515-16.) In September 2015, plaintiff visited Dr. Sure complaining of hand pain, and examination results were unchanged as compared to August 2015. (Tr. 17; *see also* Tr. 517-19.) Plaintiff returned to Dr. Sure in November 2015, reporting dizziness and blurred vision, and was referred to the emergency room to rule out a stroke. (Tr. 17, 528-30; *accord* Stip. ¶ 30.)

Plaintiff was subsequently admitted to Long Island Jewish Medical Center, where she was diagnosed with palpitations with near syncope. (Tr. 17 (citing Tr. 458-73).) Dr. Sure's November 2015 examination notes were unremarkable except for a gait abnormality. (*Id.; see also* Tr. 528-30 (November 17, 2015 examination report).)

Additionally, in March 2016, Dr. Sure examined plaintiff in the context of a follow-up for fibromyalgia with body pain. (Tr. 17.) Dr. Sure's treatment notes indicate that a review of systems was positive for back pain, joint pain, limitation of motion, and stiffness, but that Dr. Sure's examination revealed a normal spinal range of motion and no muscle tenderness or spasms. (*Id.; see also* Tr. 523-25 (March 23, 2016 examination notes).) The following month, April 2016, plaintiff returned to Dr. Sure complaining of lower back and right shoulder pain related to a motor vehicle accident.[8] (Tr. 17; *see also* Tr. 534-37 (April 3, 2016 examination notes).) Dr. Sure diagnosed polyneuropathy, back pain, fibromyalgia, and right shoulder pain. (Tr. 17; *accord* Tr. 536.) Dr. Sure again examined plaintiff in May 2016 and found, in relevant part, a normal range of motion in plaintiff's spine, and right shoulder

---

[8] The ALJ wrote that the motor vehicle accident occurred "a year earlier" relative to the April 2016 examination, (Tr. 17), but the examination notes indicate that the motor vehicle accident occurred ">1 yr," or more than one year, prior to the examination, (Tr. 534).

tenderness with restricted range of motion.  (Tr. 17-18; *see also* Tr. 475-78 (May 1, 2016 examination report).)

### 3.   The ALJ's Determination

The ALJ concluded that plaintiff's medically determinable impairments could reasonably be expected to cause plaintiff's alleged symptoms, although the ALJ did not identify the symptoms and limitations that plaintiff alleged.  (Tr. 18.) The ALJ further concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record," but did not identify or summarize the relevant statements by plaintiff.  (*Id.*)

The ALJ identified medical records relevant to plaintiff's various impairments, including her neck and lower back impairments, right and left shoulder impairments, left knee and wrist impairments, diabetes, obesity, asthma, and fibromyalgia.  (*See* Tr. 18-20 (citations omitted).)  The ALJ also noted plaintiff's treatment, including her arthroscopic surgery, trigger point and steroid injection therapy, physical therapy, and chiropractic manipulation.  (Tr. 20.) Additionally, the ALJ noted plaintiff's activities of daily living, including her ability to perform "at least some ordinary chores, such as cooking and shopping, once or twice a week," as

well as plaintiff's independence in hygiene and self-care, and ability to engage in sedentary recreational activities. (*Id.*)

The ALJ also weighed medical opinion evidence and set forth her reasons for the weight accorded to the relevant opinions. Dr. Hausknecht's opinion was given "very limited weight" because it was "based more on [plaintiff]'s self-description of her symptoms rather than the objective findings reached on a single physical examination or results of diagnostic testing." (*Id.*) Additionally, Dr. Hausknecht's opinion was reached prior to plaintiff's June 2013 shoulder surgery and her receipt of other forms of treatment, including chiropractic manipulation, physical therapy, and injections, all of which improved plaintiff's functioning. (*Id.*)

Dr. Wilson's opinion that plaintiff had a moderate partial disability was given "some weight," because it was "somewhat vague," used terms "that are not employed by the Commissioner," and was "based on only two physical examinations performed in 2013," but was "generally consistent with the evidence of record." (*Id.*) Additionally, Dr. Fkiaras's opinion was given no weight because it was "too restrictive given the overall evidentiary record." (*Id.*) The ALJ specifically noted that Dr. Fkiaras opined that plaintiff could not lift, carry, push, pull, or squat, but Dr. Han concluded otherwise a month later. (*Id.*) The ALJ also noted an internal inconsistency, as

16

Dr. Fkiaras wrote that plaintiff could perform most ordinary household chores other than cleaning and laundry, and that she could independently clean herself and complete self-care. (*Id.*)

Dr. Han's opinion was given "significant weight . . . with the exception that the [ALJ] f[ound] that it [wa]s not restrictive enough, particularly in light of [plaintiff's] shoulder impairment and radiculopathy impairment." (Tr. 21.) Additionally, Dr. Lattuga's opinion that plaintiff was to refrain from heavy physical exertion was given "significant weight" because of its consistency with the evidence. (*Id.*)

Based on the foregoing evidence and weighing of expert opinions, the ALJ concluded that plaintiff had the RFC to perform "sedentary work as defined in 20 CFR § 404.1567(a) except that she can sit for up to 6 hours in an 8-hour workday, stand and/or walk for up to 6 hours in an 8-hour workday, as well as lift and/or carry and push and/or pull no more than 10 pounds occasionally. [Plaintiff] cannot operate foot controls using the left foot. [Plaintiff] can use hand controls frequently. [Plaintiff] can reach overhead occasionally, and frequently handle and finger objects. She can occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. She can occasionally stoop, but never kneel or

crawl.  She must avoid concentrated exposure to dust, odors,
fumes and pulmonary irritants."[9]  (Tr. 13.)

### C.    Past Relevant Work Analysis

The ALJ also noted plaintiff's past relevant work with
reference to the U.S. Department of Labor's Dictionary of
Occupational Titles ("DOT").  (Tr. 21.)   As relevant to the
instant appeal, the ALJ wrote that plaintiff "ha[d] . . . worked
as a daycare supervisor which is sedentary work under DOT
092.167-010, but was actually performed at a medium level of
exertion by [plaintiff]," and that the work "is a skilled
occupation" with a specific vocational preparation of 7.  (*Id.*)

Plaintiff, however, testified that she worked as a
"family worker," not as a "daycare supervisor."  (Tr. 43-47, 49-
50.)  The conclusion that plaintiff's "family worker" employment
was employment as a "daycare supervisor" is based on the
testimony of vocational expert Bruce Martin ("VE Martin"), who
testified that he was "able to classify the [past work]
positions that [plaintiff] testified to," and that those jobs
were "psychiatric aide," "retail manager," "daycare supervisor,"

---

[9]    Although the ALJ gave "significant weight" to Dr. Han's opinion,
including his opinion that plaintiff could stand and/or walk for up to two
hours in an eight-hour day (Tr. 18 (citing Tr. 448)), the ALJ concluded that
plaintiff could stand and/or walk for up to six hours in an 8-hour day.
(*Id.*)  It appears to the court that this in fact was a typographical error
rather than a departure from Dr. Han's opinion requiring an explanation of
good reasons.

and "teacher's aide," in each case as defined in the DOT.  (Tr. 62.)

        In addition to providing testimony regarding plaintiff's past employment, VE Martin testified that a hypothetical individual of plaintiff's age and education and with additional limitations as set forth by the ALJ could work as a daycare supervisor.  (Tr. 62-63.)  VE Martin also testified that the hypothetical individual with which he was presented could work as a "document preparer," "telephone quotation clerk," and "inspector," in each case as defined in the DOT. (Tr. 63-64.)  Based on VE Martin's testimony, the ALJ concluded that plaintiff could return to past relevant work as a daycare supervisor.

## III.  Plaintiff's Contentions

        On appeal, plaintiff asserts that substantial evidence does not support the ALJ's RFC determination.  (Pl. Mem. 13-16.) Additionally, plaintiff asserts that the ALJ erred in evaluating plaintiff's past relevant work.  (*Id.* at 11-13.)

### A.  Lack of Substantial Evidence for the RFC Determination

        Plaintiff asserts that although "[t]he ALJ concluded that . . . plaintiff can do essentially a full range of sedentary activities[,] [t]he evidence suggests otherwise," (*id.* at 13), specifically, that "plaintiff is not able to engage in

regular sedentary work," (*id.* at 16 (emphasis in quoted material)).

*First,* plaintiff refers to, but does not cite, "objective tests – MRIs, EMG – [which] show extensive disc disease in the cervical and lumbar spine; substantial damage to the left knee, the wrists, and the left shoulder; and significant neurological deficits." (*Id.* at 13.) Plaintiff also refers to, but does not cite, clinical examinations showing "spasm; limited motion of the neck and back; diminished strength and sensation of the extremities; abnormal reflexes of the extremities." (*Id.*) Plaintiff asserts, in a conclusory manner and without explanation, that the foregoing objective tests and examination findings, which plaintiff does not expressly identify with record citations, are "highly supportive of the assessment of Dr. Fkiaras, the Commissioner's consulting examiner." (*Id.* at 14.) Plaintiff also asserts that the foregoing objective findings support Dr. Hausknecht's opinion that plaintiff is "totally disabled." (*Id.*)

*Second,* plaintiff takes issue with the ALJ's treatment of Dr. Han's opinion that plaintiff can sit for six hours and stand and/or walk for two hours, in each case in an eight-hour day, and can lift and/or carry ten pounds. (*See id.*) Plaintiff contends that the foregoing limitations are "not consistent with [Dr. Han's] treatment records." (*Id.*) In support of her

contention, plaintiff notes that Dr. Han reported that plaintiff "complain[ed] of low-back and left-leg pain – sharp, shooting, and throbbing, accompanied by intermittent numbness and tingling." (*Id.*) Plaintiff also quotes Dr. Han's notations that plaintiff's "[p]ain is worse with prolonged sitting, standing, and walking," that plaintiff "achieved 'minimal relief with rest and medication,'" and that plaintiff "has 'difficulty with everyday activities.'" (*Id.* (quoting Tr. 452).)

Plaintiff also asserts that Dr. Han's opinion fails to address "postural restrictions that may interfere with regular sedentary employment, *e.g.*, the need periodically to change positions from sitting to standing because of pain or discomfort." (*Id.*) Nor, according to plaintiff, does Dr. Han's opinion address plaintiff's ability to "do sedentary work each and every day, on a sustained basis." (*Id.*)

*Third*, plaintiff takes issue with the ALJ's analysis of plaintiff's activities of daily living. According to plaintiff, in "[s]eeking to find support for h[er] position," *i.e.*, her RFC determination, "the ALJ cite[d] plaintiff's ability to perform 'at least some ordinary chores' such as cooking, shopping, attending to personal hygiene, watching television, listening to [the] radio, and reading." (*Id.* at 15.) Plaintiff notes that she testified that her husband and daughter generally do chores and assist plaintiff with other

activities of daily living. (*Id.*)  Moreover, plaintiff contends

that "a person's ability to do sporadic household chores–at her

own pace, and in the manner and at the times of her choosing–is

hardly the measure of a capacity for regular, sustained

employment."  (*Id.* (citations omitted).)

## B.    Lack of Substantial Evidence for Past Relevant Work Determination

Plaintiff asserts that the ALJ erred in concluding

that plaintiff's past relevant work included time as a "daycare

supervisor" and that plaintiff could return to this work.  (*Id.*

at 11-13.)  According to plaintiff, she testified that she was a

"family worker," but VE Martin "insisted that the job was in

fact 'daycare supervisor.'"  (*Id.* at 11.)  Plaintiff contends

that the conclusion that she was a daycare supervisor is

incorrect.

In support of the foregoing contention, plaintiff

observes the DOT entry to which the VE cited "relates to a

supervisor who manages and directs the full gamut of daycare

operations" and "is a skilled position, with a[] . . . specific

vocational preparation . . . of 7, requiring 2-4 years of

training."  (*Id.*)  Plaintiff notes that she, however, "had no

such training and no such duties," as she merely "visited home-

based daycare centers to ascertain compliance with . . . rules

and regulations, to check menus, to assist with various chores,"

but "was <u>not involved</u> in matters of curriculum and teaching."
(*Id.* (emphasis in quoted material).) Thus, plaintiff asserts,
she was "an inspector and a worker, not a manager or director."
(*Id.* at 11-12.)

Plaintiff also asserts that, if her "family work" was
performed at the medium or light level, then she would be
precluded performing her past jobs in light of her RFC to
perform sedentary work only. (*Id.* at 12-13.) Therefore,
plaintiff contends, she met her burden at step four of the five-
step sequential evaluation to show that she is incapable of
performing past relevant work, and should be found disabled
absent evidence of the existence of other jobs that plaintiff
could perform and which exist in substantial numbers in the
economy. (*Id.* at 13.)

Finally, plaintiff notes that she reached age 50 on
June 30, 2016, prior to the date on which the ALJ Decision was
issued. (*Id.*) Plaintiff thus became a "person 'closely
approaching advanced age'" within the meaning of 20 C.F.R.
404.1563(d) as of that date. (*Id.*) Plaintiff contends that her
"medical-vocational" profile would place her squarely within the
ambit of 20 C.F.R., Part 404, Subpart P, Appendix 2, Rule 201.14
(Table 1) as of her 50th birthday, and that a finding that

plaintiff is disabled is therefore mandatory even if plaintiff

is capable of sedentary work.[10]  (*Id.*)

## IV.  Defendant's Contentions

### A.  Substantial Evidence Supports the ALJ's RFC Determination

Defendant counters that substantial evidence supports

the ALJ's RFC determination.  (Def. Mem. 16-23.)  With respect

to the ALJ's conclusion that plaintiff can sit, stand and walk

up to six hours per eight-hour workday, defendant notes that

"Dr. Han and Dr. Sure repeatedly found that [p]laintiff had a

normal gait and showed no difficulties walking."  (*Id.* at 16

(citing Tr. 278, 286, 453, 476, 479, 480, 485, 487, 494, 496,

497, 500, 503).)  Defendant also notes that Dr. Sure "counseled

plaintiff about the importance of taking a brisk thirty-minute

walk every day."  (*Id.* at 16-17 (citing Tr. 530).)

Additionally, the record "contains repeated findings of . . .

either slightly reduced and/or full motor strength in

[p]laintiff's upper and lower extremities."[11]  (*Id.* at 17 (citing

Tr. 249, 278-79, 287, 360, 367-68, 454, 476, 482, 485, 487).)

---

[10]    The rule to which plaintiff cites provides that a finding of disability
is mandatory where a claimant is "closely approaching advanced age," his or
her education is that of a "[h]igh school graduate or more" and "does not
provide for direct entry into skilled work," and his or her previous work
experience is "skilled or semiskilled" but his or her "skills [are] not
transferable."

[11]    Defendant also notes plaintiff's "negative straight leg raises," (Def.
Mem. 17 (citation omitted)), but the straight leg raise test is used to test
for nerve impingement in the lower back, not to test a patient's ability to
walk.  *See, e.g.,* Bradley J. Sandella, *How Is the Straight Leg Raise Test*

Defendant further asserts that the consulting examiner, Dr. Fkiaras, wrote that plaintiff "needed no help getting on and off the examination table, used no assistive devices, and could rise from her chair without any difficulty." (*Id.* (citing Tr. 366).)  Additionally, although no medical opinion specifically states that plaintiff can walk for six hours per day, "the ALJ's determination need not perfectly correspond with any medical source opinion cited in her decision; instead, the ALJ makes her RFC determination based on the record as a whole." (*Id.* (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)).)

Defendant also cites evidence in the record that defendant contends supports the ALJ's conclusion that plaintiff could lift, carry, push and pull up to ten pounds occasionally, could reach occasionally, and could frequently handle and finger objects. (*See id.* at 17-18.)  Specifically, defendant cites "repeated findings that [p]laintiff had full strength or near full[] strength in her upper extremities," (*id.* at 17 (citing Tr. 279, 287, 360, 367-68, 454, 476, 482, 485, 487)), "including [Dr. Fkiaras's] specific[] observation that [p]laintiff's hand

---

*Performed in the Evaluation of Low Back Pain (LBP)?*, Medscape, *available at* https://www.medscape.com/answers/2092651-119397/how-is-the-straight-leg-raise-test-performed-in-the-evaluation-of-low-back-pain-lbp (last accessed Aug. 6, 2019).

and finger dexterity were intact and that she had full bilateral grip strength," (*id.* (citing Tr. 368)).

Defendant also notes that plaintiff's neck MRI showed only mild disc bulging but no herniations, stenosis, or cord lesions, (*id.* at 17-18 (citing Tr. 263)), and plaintiff's back MRI showed only a small central disc herniation, no lateral disc herniation, no spinal stenosis, and no bony lesions, (*id.* at 18 (citing Tr. 264)). Defendant further notes that after undergoing left shoulder surgery in June 2013, plaintiff had only mild-to-moderate pain in her left shoulder and that plaintiff herself stated that she could lift up to 10-15 pounds. (*Id.* (citing Tr. 371 (record of post-surgery follow-up visit to Dr. Seldes regarding left shoulder surgery) and Tr. 204 (plaintiff's function report)).)

Defendant further contends that the ALJ properly weighed opinion evidence regarding plaintiff's RFC. (*Id.* at 18-22.) According to defendant, Dr. Han's opinion regarding plaintiff's functional limitations, which the ALJ gave "significant weight," is consistent with the foregoing evidence regarding plaintiff's gait, straight leg test results, and motor strength. (*Id.* at 19 (citations omitted).) Additionally, to the extent Dr. Han's opinion was not consistent with evidence regarding plaintiff's shoulder impairment and resulting limitations, the ALJ "adjusted the RFC accordingly." (*Id.*

(citing Tr. 21).)  Defendant further contends that the ALJ
properly weighed Dr. Lattuga's opinion that plaintiff should
refrain from heavy lifting, carrying, or bending because this
opinion was consistent with the overall evidence, and despite
evidence indicating strength in plaintiff's extremities and
reports that plaintiff's back pain was alleviated through an
epidural, the record contains significant evidence that
plaintiff's condition was exacerbated by heavy exertion.  (*Id.*
at 19-20 (citations omitted).)  Defendant also notes that Dr.
Lattuga's opinion is consistent with the limitations set forth
in Dr. Han's opinion.  (*Id.* at 20 (citations omitted).)

        Defendant further contends that the ALJ properly
weighed Dr. Wilson's opinion that plaintiff has a "moderate
partial disability."  (*Id.* (citing Tr. 20); *see also* Tr. 248-52
(Dr. Wilson's opinion).)  According to defendant, Dr. Wilson's
conclusion that plaintiff has a moderate partial disability is
"vague," employs the concept of "partial disability," which is
not recognized under the Act, and consequently "provides little
helpful information about the functional limitations, if any"
resulting from plaintiff's impairments.  (Def. Mem. 20.)
Additionally, as the ALJ noted, the treatment relationship
between Dr. Wilson and plaintiff was limited, as Dr. Wilson
examined plaintiff on only two occasions.  (*Id.*)  Further, the
ALJ noted that Dr. Wilson's examination findings were consistent

with other evidence, including later treatment records. (*Id.*)
In particular, Dr. Wilson noted reduced to full muscle strength
in plaintiff's upper and lower extremities, as well as limited
range of motion in her neck (cervical spine) and left
extremities. (*Id.* at 20-21 (citing Tr. 250-51).)

Additionally, defendant argues that the ALJ did not
err in affording "very little weight" to Dr. Hausknecht's
opinion and "no weight" to Dr. Fkiaras's opinion. (*Id.* at 21-
22.) With respect to Dr. Hausknecht, defendant notes that his
statement that plaintiff is "totally disabled" is an opinion on
an issue reserved to the Commissioner and is not entitled to any
special deference. (*Id.* at 21 (citing 20 C.F.R. § 404.1527 and
*Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).) Defendant
also asserts that the ALJ "properly noted that Dr. Hausknecht
based his opinion on a single examination on June 3, 2013, prior
to [p]laintiff's corrective shoulder surgery later tha[t]
month," and prior to plaintiff's subsequent steroid injections,
physical therapy, and chiropractic treatment. (*Id.* (citing Tr.
20, 267, 286-87, 336-42).) Additionally, defendant notes that
Dr. Seldes's treatment records indicate that plaintiff's left
shoulder range of motion increased and she reported
"significant" lower back relief and improved activities of daily
living and function after receiving injections. (*Id.* (citing

Tr. 373-74 (range of motion), Tr. 285 (lower back relief and improved daily living).)

With respect to Dr. Fkiaras, defendant asserts that the "extreme limitations set forth in Dr. Fkiaras's opinion, such as no lifting, pulling, pushing, or carrying were not consistent with the overall evidence" in the record, and is inconsistent with Dr. Han's opinion, which was rendered only one month later. (*Id.* at 21-22 (citing Tr. 365-68, 448-49 (Dr. Fkiaras and Dr. Han opinions)).) Further, although Dr. Fkiaras opined that plaintiff could do no lifting or carrying, plaintiff herself reported that she could carry up to 10-15 pounds, and clinical evidence supports this report. (*Id.* at 21 (citing Tr. 204).) Defendant also asserts that Dr. Han was "a treating physician who examined [p]laintiff multiple times," and that consequently Dr. Han's opinion is "properly given great consideration," including relative to Dr. Fkiaras's opinion. (*Id.* at 22 (citing Pl. Mem. 14 and 20 C.F.R § 404.1527(c)).)

## B. Substantial Evidence Supports the ALJ's Past Relevant Work Determination

Defendant also asserts that the ALJ's inquiry regarding plaintiff's past relevant work at step four was proper. Defendant notes that an ALJ may consult with a vocational expert at step four so long as the ALJ does so in accordance with 20 C.F.R. § 404.1560(b)(2) and the assumptions

upon which the expert bases his or her opinion are supported by substantial evidence. (*Id.* at 24 (citing, in relevant part, *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014)).)

According to defendant, "[h]ere, the ALJ asked . . . VE [Martin] to classify [p]laintiff's prior work in accordance with the [DOT]," and VE Martin "testified that [p]laintiff's past work as a family worker would be classified as a daycare supervisor, which is DOT number 092.167-010." (*Id.*) The ALJ further testified that plaintiff actually performed that work at the medium exertional level, although the job is generally performed as sedentary work. (*Id.* (citing Tr. 62).)

Additionally, the ALJ presented a hypothetical person to VE Martin and asked VE Martin to opine as to whether the hypothetical person could work as a daycare supervisor as that work is generally performed in the national economy. (*Id.* (citing Tr. 64).) Defendant contends that the hypothetical that the ALJ presented the VE is more restrictive than the RFC set forth in the ALJ's decision, because the hypothetical "did not include the finding that [p]laintiff could stand/walk for six hours out of an eight-hour day, and it included a finding that plaintiff could *never* reach overhead, as opposed to the ultimate RFC finding that [p]laintiff could occasionally reach overhead." (*Id.* at 24-25 (citing Tr. 13, 62-64).).

Defendant also points to statements and testimony by plaintiff that defendant contends support the ALJ's conclusion that plaintiff worked as a daycare supervisor. (*Id.* at 25-26.) Specifically, defendant contends that "[p]laintiff stated on three occasions that [her past work] was a supervisory position, specifically stating that she supervised 12 family daycares." (*Id.* at 25 (citing Tr. 48, 68, 236).) Additionally, defendant contends that plaintiff's description of her job duties as a "family worker" is consistent with the DOT's description of the "daycare supervisor" position. (*Id.* at 25-26 (citations omitted).) Defendant points to the following excerpt from plaintiff's testimony before the ALJ, in which plaintiff describes her work as a family worker:

> I had to go [to the daycare facilities] and visit, make sure . . . they had everything to code, and then we allowed them to open. I made sure they had their sections for the children that were properly done, and had the proper things in place . . . Then I used to go maybe two or three times a week to their family daycares just to check. I used to sit and make sure their menus were good, and that the children were okay, and that they were following protocol.

(*Id.* (quoting Tr. 46).)

Additionally, plaintiff "clarified at the hearing" that on her visits, she provided daycare facilities with suggestions about their work, including regarding menu planning, and that although she did not actually hire or fire employees,

she prepared the necessary paperwork.  (*Id.* at 26 (citing Tr. 42, 68).)

Finally, defendant asserts that even if plaintiff's position was not classified properly, the VE identified three other positions that the hypothetical person could perform. (*Id.* (citing Tr. 63-64).)  Thus, according to defendant, plaintiff is capable of performing jobs that exist in the national economy and is not disabled.  (*Id.*)

**DISCUSSION**

**I.  Applicable Law and Legal Standards**

**A.    Judicial Review Generally**

A court's review of the Commissioner's final decision as to a plaintiff's disability is not *de novo*, and the court can enter a judgment affirming, modifying or reversing the Commissioner's final decision with or without remanding the case.  *Filicomo v. Chater*, 944 F. Supp. 165, 168 (E.D.N.Y. 1996); *see also* 42 U.S.C. § 405(g).

**B.    The Substantial Evidence Standard**

A district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's conclusions were based on the correct legal standard and were supported by substantial evidence in the record.  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)).  Substantial

evidence means more than a mere scintilla; it means such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion. *Talavera*, 697 F.3d at 151 (citing
*Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In
determining whether the Commissioner's findings are supported by
substantial evidence, "the reviewing court is required to
examine the entire record, including contradictory evidence and
evidence from which conflicting inferences can be drawn."
*Talavera*, 697 F.3d 145, 151; *see also Mongeur v. Heckler*, 722
F.3d 1033, 1038 (2d Cir. 1983).

If the court finds that there is substantial evidence
supporting the Commissioner's decision, the decision must be
upheld even if there is also substantial evidence for the
plaintiff's position. *See Alston v. Sullivan*, 904 F.2d 122, 126
(2d Cir. 1990); *see also DeChirico v. Callahan*, 134 F.3d 1177,
1182 (2d Cir. 1998) (affirming Commissioner's decision where
substantial evidence supported both sides). The rule that the
Commissioner's findings of fact, as well as the inferences and
conclusions to be drawn from those findings, are conclusive
applies even in those instances where a reviewing court's
independent analysis of the evidence may differ from the
Commissioner's analysis. *See Rutherford v. Schweiker*, 685 F.2d
60, 62 (2d Cir. 1982)

## C.   Five-Step Sequential Evaluation Process

To be eligible for disability benefits under 42 U.S.C. § 423, the claimant must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months" and the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). Additionally, to qualify for disability benefits, "an applicant must be insured for disability insurance benefits" at the time of onset.  *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1)).

The Commissioner's regulations prescribe the following five-step framework for evaluating disability claims:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an

> impairment, the Commissioner will consider him
> [per se] disabled . . . . Assuming the claimant
> does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe
> impairment, he has residual functional capacity
> to perform his past work. Finally, if the
> claimant is unable to perform his past work, the
> burden of proof shifts to the Commissioner to
> determine whether there is other work which the
> claimant could perform.

*Talavera*, 697 F.3d at 151; *see also* 20 C.F.R. §§ 404.1520(a),

416.920(a).

## II.   Application

### A.   The ALJ's RFC Determination

Between step three and step four of the five-step

disability evaluation process, the ALJ must determine a

claimant's residual functional capacity, or RFC.  A claimant's

RFC is based on all the relevant evidence of record, which

includes the claimant's credible testimony regarding the

limiting effects of his impairments, both those deemed severe

and non-severe at step two, objective medical evidence

documenting signs and symptoms of impairments and functional

limitations, and medical opinion from treating and consulting

sources regarding the claimant's ability to function.  20 C.F.R.

§ 404.1545.  The RFC assessment also considers exertional and

non-exertional work functions.  By definition, sitting,

standing, walking, lifting, carrying, pushing and pulling, are

all deemed "exertional" functions.  20 C.F.R. § 404.1569a(b).

All other functions are deemed "non-exertional" functions.

Pain, and other subjective symptoms related to a medically determinable impairment (*e.g.*, fatigue), may affect both the exertional and non-exertional functions of work, and are factored into the residual functional capacity assessment. 20 C.F.R. § 404.1529.

The ALJ determined that plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) subject to certain additional physical and exertional limitations. (Tr. 13.) As set forth in the Code of Federal Regulations ("CFR"), sedentary work

> involves lifting no more than 10 pounds at a time
> and occasionally lifting or carrying articles
> like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which
> involves sitting, a certain amount of walking and
> standing is often necessary in carrying out job
> duties. Jobs are sedentary if walking and
> standing are required occasionally and other
> sedentary criteria are met.

20 C.F.R. § 404.1567(a).

With respect to plaintiff's additional limitations, the ALJ determined that plaintiff can sit for up to six hours in an eight-hour workday; can stand and/or walk for up to six hours in an eight-hour workday; can lift and/or carry and push and/or pull no more than 10 pounds occasionally; cannot operate foot controls using the left foot; can handle and finger objects and use hand controls frequently; can occasionally reach overhead, stoop, and climb ramps and stairs; can never kneel, crawl, or

climb ladders, ropes or scaffolds; and must avoid concentrated exposure to dust, odors, fumes and pulmonary irritants. (Tr. 13.)

Here, there is substantial evidence to support the ALJ's RFC determination. Though it appears the ALJ departed from Dr. Han's opinion by concluding plaintiff could stand or walk for six hours in a given workday, and that such departure was error in the absence of good reasons, this court finds the departure is likely a typographical error and, in any event, harmless. The ALJ correctly articulated Dr. Han's opinion that plaintiff could stand and/or walk for up to two hours later in her decision. (Tr. 18.) Moreover, even if the ALJ departed without good reason, the ALJ nonetheless determined plaintiff's RFC was sedentary, consistent with Dr. Han's opinion that plaintiff was limited to two hours of standing or walking in an eight-hour workday. *See* SSR 96-9p, 1996 WL 374185 (July 2, 1996) ("Jobs are sedentary if walking and standing are required occasionally . . . no more than about 2 hours of an 8-hour workday."). Thus, the ALJ's error, whether typographical or otherwise, was harmless and the ALJ's RFC determination must stand.

**B.    The ALJ's Past Relevant Work Analysis**

To avoid a need for further appeals, the court also notes error in the ALJ's step four analysis. At step four, the

Commissioner must determine whether the claimant's RFC permits the claimant to perform his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1). If the claimant can perform his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(f).

Here, the ALJ concluded that plaintiff's past relevant work included work as a daycare supervisor, as defined in the DOT 092.167-010. (Tr. 13.) Plaintiff testified that she had previously worked as a "family worker," but VE Martin testified that this work had been daycare supervisor work as defined in the DOT, and the ALJ relied on VE Martin's testimony. There is not, however, substantial evidence that plaintiff's past relevant work included work as a daycare supervisor as defined in the DOT.

The DOT's definition of daycare supervisor or director at occupation code 092.167-010 requires that the person performing the job "direct[] activities of [a] . . . child development facility to provide instruction and care for children" by

> [p]reparing and submit[ting] [a] facility budget
> to board of trustees, administrative agency, or
> owner for approval[;] [a]uthoriz[ing] purchase[s]

> of instructional materials and teaching aids,
> such as books, toys, and games designed to
> stimulate learning[;] [i]nterview[ing] and
> recommend[ing] hiring of teaching and service
> staff[;] [c]onfer[ing] with parents regarding
> facility activities, policies, and enrollment
> procedures[;] [c]onferring with teaching staff
> regarding [a] child's behavioral or learning
> problems, and recommend[ing] methods of modifying
> inappropriate behavior and encouraging learning
> experiences[;] [r]eview[ing] and evaluat[ing]
> facility activities to ensure conformance to
> state and local regulations[; and] [r]eview[ing]
> and approv[ing] menu plans and food purchases.

*Dictionary of Occupational Titles* ("DOT") 092.167-010, 1991 WL 646894.

The only record evidence regarding plaintiff's job duties as a "family worker" is her own testimony, which does not constitute substantial evidence that such work fell within the DOT's definition of "daycare supervisor." Defendant points specifically to plaintiff's testimony that she visited daycare centers and "ma[d]e[] sure . . . they had everything to code," and would "sit and make sure their menus were good, and that the children were okay, and that they were following protocol." (Def. Mem. 25-26 (quoting Tr. 46).) Defendant also notes plaintiff's testimony that she would make "suggest[ions]" regarding children's food menus to staff at various daycares that she visited in the course of her job. (Tr. 46; Def. Mem. 26 (citation omitted).) Additionally, defendant notes plaintiff's testimony that she "wouldn't hire or fire" teachers directly, but would instead "write the paperwork, and submit it

to [the] program director, wh[o] . . . was in charge of hiring and firing."  (Tr. 68-69; Def. Mem. 26.)

Nothing in defendant's cited testimony, however, establishes that plaintiff had supervisory power to approve or disapprove menu plans, as set forth in the DOT's description of the daycare supervisor job.  Instead, plaintiff testified only that she "suggested things" to daycare staff regarding menus and that she provided staff members with menu suggestions that they "c[ould]" opt to implement.  (Tr. 46.)  Thus, plaintiff's testimony suggests that daycare staff were free to discard her suggestions, and consequently that plaintiff did not in any material sense "approve[]" or reject any menus plans.  Similarly, plaintiff's testimony that the "program director . . . was in charge of hiring and firing," (Tr. 69), establishes that plaintiff herself did not actually hire or fire employees.

Further, nothing in plaintiff's testimony indicates that she performed any other functions of "daycare supervisors" as set forth in the DOT.  More specifically, plaintiff's testimony is silent as to her involvement, if any, in budgeting; authorizing purchases of instructional materials; conferring with parents regarding daycare a facility's activities, policies, and enrollment procedures; conferring with teachers regarding children's behavioral or learning problems; and

recommending methods of modifying inappropriate behavior and encouraging learning experiences.

Plaintiff's testimony only establishes that her job duties as a "family worker" were similar to two duties of daycare supervisors. Her testimony, however, is wholly silent regarding the many other daycare supervisor job duties, especially the more substantial duties, set forth in the DOT, and thus does not suffice to establish that plaintiff was a daycare supervisor. In reaching this conclusion, the court notes that plaintiff's testimony is no more consistent with the DOT's definition of "daycare supervisor" than it is with other occupations described in the DOT, including "nutritional consultant," DOT 077.127-018, 1991 WL 646783, and "program consultant" or "community service consultant," DOT 195.167-010, 1991 WL 671582. Indeed, though plaintiff used the word "supervise" several times to describe her responsibilities, her work was more akin to that of an inspector ensuring facilities complied with statutory requirements. And, even if plaintiff had described herself expressly as a director, her stated duties do not conform at all with the description of a daycare director as listed in the DOT.

Consequently, the court concludes that the ALJ's step four conclusion is not supported by substantial evidence. On remand, the ALJ shall reevaluate her determination regarding

plaintiff's past relevant work, and shall elicit further
testimony from a vocational expert to determine the proper
classification of plaintiff's past relevant work as a "family
worker," and shall ensure that substantial evidence in the
record supports any determination regarding the nature of
plaintiff's past relevant work.

Additionally, plaintiff reached age 50 on June 30,
2016, prior to the date on which the ALJ Decision was issued.
Consequently, plaintiff became a person "closely approaching
advanced age" within the meaning of 20 C.F.R. 404.1563(d) as of
July 30, 2016.  The ALJ likely ignored 20 C.F.R., Part 404,
Subpart P, Appendix 2, Rule 201's grids because she determined,
erroneously as discussed above, that plaintiff's past relevant
work as a "family worker" complied with the DOT's definition of
a daycare supervisor.  The ALJ further determined that the work
of a daycare supervisor is performed at the sedentary level.
(Tr. 21.)  Absent that erroneous determination, plaintiff's past
relevant work does *not* include any work classified as sedentary.
Indeed, the ALJ noted plaintiff's work as a "family worker" was
performed at a medium exertion level.  (*Id.*)  On remand, and to
the extent necessary in light of the ALJ's other determinations,
the ALJ shall consider the impact of 20 C.F.R., Part 404,
Subpart P, Appendix 2, Rule 201.14, on plaintiff's claim for
Title II Disability Insurance Benefits.  Assuming plaintiff

falls within the ambit of Rules 201.14 or 201.15 given her status as closely approaching advanced age, the ALJ should determine if plaintiff's skills are transferable or not.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for judgment on the pleadings is GRANTED in part to the extent this action is remanded, and DENIED in part. Defendant's cross-motion for judgment on the pleadings is DENIED. This action is hereby remanded for further proceedings consistent with this Order.

**SO ORDERED.**

Dated:     August 6, 2019
           Brooklyn, New York

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York